**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| v. ) | No. 14 CR 131-4 |
| ) | |
| DOMENIKO EVTIMOV, ) | Judge Ronald A. Guzmán |
| ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

For the reasons stated below, the motion to suppress foreign wiretaps [386] is denied.

## STATEMENT

The government has brought a 29-count, 17-defendant indictment alleging an international bank card fraud/identity theft ring. Defendant Domeniko Evtimov, a U.S. citizen, has filed a motion to suppress any and all electronic interceptions, overhears, wiretaps, or the like, as well as any fruits derived therefrom, conducted by either the Bulgarian National Security Agency or its internal national police, at the behest of the U.S. government and in joint venture with them, beginning on or about February 9, 2012.

In summary, the government's indictment alleges that Evtimov and other suppliers sent fraudulently-obtained debit and credit card numbers, along with their associated personal identification numbers ("PINs"), from Bulgaria to codefendant Gheorgui Martov in the United States. Martov then oversaw a crew in Chicago, who transferred the fraudulently-obtained card information onto blank cards with magnetic stripes and used those cards (with the associated PINs) to attempt coordinated fraudulent withdrawals from banks. A portion of the proceeds of the fraudulent withdrawals was transmitted back to Evtimov in Bulgaria. Pursuant to information from a cooperating witness ("CW"), the government obtained court authorization to

intercept wire and electronic communications of two phones used by Martov between October 25, 2011, and December 22, 2011, and January 13, 2012, through February 10, 2012. These wiretaps disclosed conversations between Martov and Evtimov in which they discussed aspects of the scheme to defraud, including Evtimov's transmission of fraudulently-obtained card numbers online to Martov, reports of the results of efforts to withdraw money using the fraudulently-obtained numbers, and the occurrence of a wire transfer payment of $1,000.00 by Martov in the name of Evtimov's wife in Bulgaria.

On November 14, 2011, the FBI's Office of Legal Attache in Bulgaria sent a letter to the Prosecutor General's Office in Bulgaria, with a copy to the Bulgarian State Agency for National Security ("SANS" or "DANS") and the Financial Security Specialized Directorate within SANS, describing in general the fraud scheme. The purpose of the letter was "to provide information to your service toward furthering dialogue concerning establishing a full criminal investigation." The letter stated:

> The goal of the proposed parallel investigation with DANS is to assist the FBI in identifying co-conspirators involved in the aforementioned criminal acts in Bulgaria and throughout Europe. It is the FBI's hope that telephone subscriber information and toll records, bank records, and other investigative methods used by DANS can be collected and provided to the FBI for prosecution in the United States.

(Def's. Ex. B, 11/14/11 Letter, Dkt. # 387.) Seven days later, the FBI sent a request that electronic interceptions made by SANS be marked unclassified in order to allow the U.S. government to use the information in its investigation and or prosecutions. (Def.'s Ex. C., Dkt. # 387, at Pages 7-8 of 59.)

Approximately two months later, on January 16, 2012, the FBI sent another

communication to SANS. (Def.'s Ex. E, 1/16/12 Letter, Dkt. # 387, at Page 16 of 59.) This letter informed the Bulgarian authorities that Martov had been intercepted communicating with individuals in Bulgaria using Bulgarian phone numbers regarding ATM skimming, cashing out of stolen debit card numbers, and financial institution fraud. (*Id.,* at Page 17 of 59.) The letter included seven Bulgarian phone numbers along with the names of the possible users for some of the users, including a number identified as belonging to Evtimov. The FBI requested that SANS "conduct electronic surveillance (wiretap) on the above Bulgarian telephone numbers," obtain subscriber information and toll records, as well as conduct "physical surveillance or another type of investigative technique which can be used to positively identify the user of each of the telephone numbers." (*Id.*) The FBI also indicated it "would like the intercepted calls and texts be declassified for future use in United States criminal proceedings in order to prosecute the subjects involved in the ATM skimming/cash out conspiracy." (*Id.*)

Following the FBI's request, SANS verified, by reference to Bulgarian databases, a request to the Sofia City Regional Court, and corroboration by data already known to SANS prior to the FBI's request, that Evtimov was the subscriber of the Bulgarian phone number provided by the FBI. The Bulgarian authorities's decision to seek wiretap authorization was based upon both the information provided by the FBI and information independently obtained by SANS. The initial wiretap request was prepared on or about February 2, 2012 by a senior agent of SANS in accordance with Bulgarian procedure. (Gov't's Ex. A, Dkt. # 404-1, ¶¶ 16, 21.) Although the affidavit itself is not available to the United States, we do know

the request contained a full and comprehensive list of facts and circumstances, a comprehensive description of investigative activities, a full identification of Domeniko Evtimov, a request to use special intelligence means for 60 days, a request to use surveillance and wiretapping, the names and contact numbers for investigating officials to be notified of the results, information concerning the impossibility or exceptional difficulties faced in collecting the necessary information using other methods, and specified money laundering (under Article 253 of the Bulgarian Penal Code) as the offense being investigated. (*Id.* ¶ 22.) The request was granted by Judge Dimov of the Sofia city court for the time period of February 8, 2012, through April 7, 2012. (*Id.* ¶ 23.) A 120-day extension was requested on or about April 2, 2012, and also granted by Judge Dimov. (*Id.* ¶ 25.) On or about July 26, 2012, SANS sent a formal letter, signed by the Deputy Chairman of SANS to the Sofia city court to inform the judge that the wiretap was terminated before the expiration of its allowed time. (*Id.* ¶ 28.)

Courts have held that Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–2520, does not apply outside the United States. *United States v. Maturo*, 982 F.2d 57, 60 (2d Cir. 1992) (citing *Stowe v. Devoy,* 588 F.2d 336, 341 (2d Cir. 1978), *cert. denied,* 442 U.S. 931 (1979)). Evidence obtained from a search of a United States citizen by foreign law enforcement is generally admissible independent of any Fourth Amendment analysis absent the "substantial participation" of United States law enforcement. *United States v. Stokes*, 726 F.3d 880, 890 (7th Cir. 2013). Only if the foreign law enforcement officials were essentially agents of the United States law enforcement officials or the cooperation

between the two was designed to evade the constitutional restraints placed on American law enforcement officials will a Fourth Amendment analysis be applied. *United States v. Getto*, 729 F.3d 221, 227-28 (2d Cir. 2013).

Both the government and the defendant cite the Seventh Circuit's decision in S*tokes,* 726 F.3d 880, in support of their positions. *Stokes* involved a joint operation in which U.S. Immigration and Customs Enforcement ("ICE"), in conjunction with the Royal Thai Police, searched Stokes's home in Thailand and recovered a camera, a computer, and several compact discs containing thousands of images of Stokes's sexual activity with Thai boys. *Id.* at 885. Based upon information from their own investigation, ICE agents requested assistance from the Royal Thai Police, and in response, the Royal Thai Police assigned narcotics officers to the investigation. Thai officers obtained a warrant authorizing a search of Stokes's home "to locate and seize any illegal items and narcotics . . . of which possession is considered illegal, or which was illegally obtained, or which has been used or is intended to be used to commit a crime." <u>Id.</u> <u>at</u> 886. Early in the morning of October 9, 2003, ICE agents and the Royal Thai Police executed the warrant at Stokes's home. Because Stokes was not at home when they arrived, they waited for him before entering, and their ultimate search resulted in retrieval of the aforementioned evidence, which was later admitted into evidence at Stokes's trial.

The district court found that because U.S. authorities initiated the investigation of Stokes *and* fully participated in the search of his home, the search was a joint operation and some measure of Fourth Amendment protection applied. The Seventh Circuit agreed based on the circumstances of that case, and in affirming the trial court's ruling, stated as follows:

> Evidence obtained in a search of an American citizen by foreign
> authorities operating within their own country is generally

> admissible in the courts of the United States even if the search does not otherwise comply with our law, including the law of the Fourth Amendment. *See United States v. Emmanuel,* 565 F.3d 1324, 1330 (11th Cir. 2009) ("The general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or the law of the foreign country."); *United States v. Barona,* 56 F.3d 1087, 1096 (9th Cir. 1995); *United States v. Peterson,* 812 F.2d 486, 490 (9th Cir. 1987); *United States v. Morrow,* 537 F.2d 120, 140 (5th Cir. 1976). But if U.S. agents substantially participate in an extraterritorial search of a U.S. citizen and the foreign officials were essentially acting as agents for their American counterparts or the search amounted to a joint operation between American and foreign authorities, the Fourth Amendment generally applies. *See Emmanuel*, 565 F.3d at 1330; *Barona*, 56 F.3d at 1096; *Peterson*, 812 F.2d at 490; cf. *United States v. Marzano,* 537 F.2d 257, 269–71 (7th Cir. 1976) (holding that FBI agents who merely supplied information to Grand Cayman police and observed but did not participate in the search by authorities in that country did not trigger Fourth Amendment protection).

*Stokes*, 726 F.3d at 890-891.

Evtimov argues that it "appears rather likely" that it can be shown that the FBI agents began coordinating with the Bulgarian agents under the authority of the Extradition Treaty with Bulgaria and the *Agreement on Certain Aspects of Mutual Legal Assistance in Criminal Matters with Bulgaria* ("MLAT").[1] In support of this conclusion, the defendant cites to select portions of the MLAT Agreement and its Annex. For example, he points out that Section 1, Article 2 of the MLAT Annex provides that joint investigative teams may be established where deemed appropriate by the United States of America and the Republic of Bulgaria. Section 2 of Article 2, however, goes on to specify that procedures under which the team is to operate, "such as its composition, duration, location, organization, functions, purpose, and terms of participation of

---

[1] A copy of MLAT and its Annex can be found at http://www.state.gov/documents/organization/188254.pdf.

team members of a State in investigative activities taking place in another State's territory, shall be as agreed between the competent authorities responsible for the investigation or prosecution of criminal offenses, as determined by the respective States concerned." MLAT, Art. 2 § 2. This language, not cited by Evtimov, indicates that the "joint investigative team" procedures address cooperation in situations in which teams are formed and members are to participate in another State's territory.

Nothing could be further removed from what happened in the case at bar. Here, there were no teams of agents from different countries and there was no U.S. participation whatsoever in the search conducted in Bulgaria by Bulgarian authorities -- a critical distinction. In *United States v. Marzano,* 537 F.2d 257 (7th Cir. 1976), *abrogation recognized on other grounds*, *United States v. Loniello*, 610 F.3d 488, 496 (7th Cir. 2010), U.S. government agents were actually present and observed as Grand Cayman Islands police, based upon information the FBI had provided, searched the home of and arrested a U.S. citizen for prosecution in the United States. *Id*. at 270. In that case, because the U.S. agents merely observed and did not actually participate, the Seventh Circuit deemed those facts insufficient to trigger the application of the Fourth Amendment. *Id*. ("FBI agents were present with Superintendent Tricker at various times during his investigation and search, but there is no evidence that they took an active part in interrogating or searching the suspects or in selecting evidence to seize. Mere presence of federal officers is not sufficient to make the officers participants.").

As noted, in the instant case, U. S. law enforcement agents were not present and did not interact or participate in either the procurement of a search warrant by SANS or in the execution of the warrant. No basis exists for a finding that the Bulgarian authorities were essentially acting

as agents for their American counterparts or that the wiretap search was a joint operation.  In fact, because the wiretap request is a considered a classified document under Bulgarian law, Bulgarian authorities have refused to share it with U.S. law enforcement.

The law is also clear that a mere purpose to assist the U.S. government is insufficient to transform a search executed entirely by foreign law officers into a government search to which the Fourth Amendment applies.  *See id*. at 271 ("The defendants violated Grand Cayman law, according to [Grand Cayman law enforcement], and that is the reason for which [they] arrested them.  That he might also have intended to help the United States is not a sufficient reason to treat his actions as those of United States agents.")  If U.S. federal agents do not join in the search, seize any evidence or interrogate any suspects but merely confer with those who do, there is no basis for requiring that the search must be conducted according to federal standards.  *See United States v. Johnson*, 451 F.2d 1321, 1322 (4th Cir. 1971) ("Federal agents conferred with the state officers about the investigation, but they did not assist in obtaining the warrant.  Three federal agents were present when the state officers searched the premises.  They did not, however, join in the search, seize any evidence, or interrogate any suspects.  We believe the district judge correctly held that the federal agents were present simply as observers and that they did not participate in the search.").  *See also United States v. Behety*, 32 F.3d 503 (11th Cir. 1994) (neither Drug Enforcement Administration ("DEA") agents' communication to Guatemalan authorities regarding arrival of United States vessel in Guatemala to pick up cocaine for export, nor DEA agents' presence at, and videotaping of, search of vessel by Guatemalan officials triggered exclusionary rule respecting evidence seized during search.).

Similarly, in a case also involving a formal joint cooperation agreement between the

United States and Canada, *United States v. Baboolal*, 05-CR-215, 2006 WL 1674480 (E.D. Wis. June 16, 2006), report & recommendation adopted by 2006 WL 1942357 (E.D. Wis. July 11, 2006), the defendant alleged that a joint venture existed because United States and Canadian law enforcement had created the "Toronto Strategic Partnership" to cooperate in the investigation of telemarketing fraud. In the course of investigating complaints of fraud from U.S. citizens, agents of the Social Security Administration and the Federal Trade Commission, who were part of the Toronto Strategic Partnership, developed information that the defendant may be involved in the alleged fraud. *Id*. at *3. In obtaining a search warrant, the Canadian authorities utilized the information obtained by the U. S. agents and information obtained by Canadian investigators. The court found that although they utilized information developed by U. S. investigators, it was Canadian law enforcement officers who were enforcing Canadian laws when they chose to obtain and execute the search warrant. *Id*. at *4. The court concluded that "[e]ven though there was cooperation in the investigation, the actual search and seizure was not a joint venture between U.S. and Canadian law enforcement" and thus the Fourth Amendment did not apply. *Id*.

     The caselaw makes clear that the express terms of a law enforcement agreement between the United States and a foreign government do not establish the parameters of a U.S. court's Fourth Amendment analysis. The defendant's argument concentrates on the types of cooperation the MLAT Agreement provides for rather than what actually occurred in the case at bar. As pointed out above, the U.S. authorities were required to make formal requests for information regarding the investigation and were denied access to some portions of the investigation. The defendant's contention that it is unlikely that SANS would have conducted the wiretap absent the

FBI's request because SANS already possessed information regarding Bulgarians involved in card skimming offenses "yet counsel is unaware of any related cases that were charged in the Bulgarian Courts" is sheer speculation. While the FBI likely gave SANS additional information upon which to base its application for a wiretap, there is nothing in the record to indicate any active participation by the FBI in the SANS investigation and thus, no basis for an evidentiary hearing. Whether SANS has or intends in the future to file charges against these or other defendants or simply to allow the defendants to be prosecuted in the United States is unknown and not of great import as it does not bear upon the degree to which there was any active participation by the U.S. in SANS' actual search.

For all of these reasons, the Court finds that the record establishes that the interception of Evtimov's phone calls was not a joint operation nor were Bulgarian law enforcement authorities acting as agents for U.S. law enforcement when they conducted their search.

Even if the Court were to consider, *arguendo,* the SANS wiretaps to constitute searches by U.S. law enforcement, "the Fourth Amendment's warrant requirement, and by extension the strictures of the Warrant Clause, do not apply to extraterritorial searches by U.S. agents." *Stokes*, 726 F.3d at 893. Instead, in such situations, all the Fourth Amendment requires is that the search be reasonable under the totality of the circumstances. *Id*. *See also In re Terrorist Bombings of U.S. Embassies in E. Africa*, 552 F.3d 157, 167 (2d Cir. 2008) ("[W]e hold that the Fourth Amendment's warrant requirement does not govern searches conducted abroad by U.S. agents; such searches of U.S. citizens need only satisfy the Fourth Amendment's requirement of reasonableness.").

The reasonableness standard is easily satisfied in the case at bar. At the time of SANS's initial wiretap request, the FBI had already obtained permission under the strict Fourth Amendment requirements to conduct wiretaps of Martov's two telephones, and had recorded calls between Evtimov and Martov evidencing Evtimov's participation in the fraudulent scheme. Thus, the U. S. authorities already knew that Evtimov was involved in the scheme and that it was his practice to conduct the fraudulent scheme's business by telephone – making the interception of the targeted phone numbers a perfectly reasonable next step in the investigation. In addition, Bulgarian law enforcement authorities corroborated the information provided by the U.S. law enforcement officers through their own sources and concluded that the search was proper under Bulgarian law. Finally, the SANS's wiretap request, which included an extensive affidavit, was deemed sufficient by the Bulgarian judge who granted the initial permission as well as an extension. Thus, the wiretap was clearly reasonable based on the totality of the circumstances -- two law enforcement agencies and a duly authorized Bulgarian judicial officer concluded that the wiretaps were reasonable, and a U.S. federal district court judge had previously concluded that there was probable cause for the interception of Martov's phone calls, including those with Evtimov.[2]

---

[2] Defendant argues that the Court has no independent verification that the wiretap complied with Bulgarian law – other than "an after-the-fact affidavit from a Bulgarian SANS agent who apparently petitioned the Sofia City Court." The defendant's breezy dismissal of a detailed and thorough affidavit makes no sense at all. Affidavits from law enforcement officers are universally understood to be sufficient for courts in the United States to determine probable cause to issue search warrants. Why should such affidavits from a foreign law enforcement officer not be sufficient for those same courts to determine the reasonableness of his conduct? If a detailed and thorough affidavit is not sufficient, then an evidentiary hearing would always be required. Ironically, it is the very MLAT Agreement the defendant relies upon in arguing there exists a joint enterprise that prohibits SANS from sharing the actual affidavit submitted in support of the Sofia City Court's search warrant. This fact also militates against a finding of joint

The standard for approving a wiretap request under Bulgarian law clearly meets the reasonableness inquiry. First, Bulgarian law restricts the use of wiretaps to persons who are reported to, and for whom there are reasonable grounds to presume are preparing to commit, are committing, or have committed a crime which carries a potential punishment of imprisonment of more than five years. (Gov't's Ex. A, Dkt. # 404-1, ¶ 9.) In addition, an application for a wiretap in Bulgaria must also include an explanation as to why the evidence cannot be collected by alternative means. (*Id.* ¶ 11(g).) An application that meets this standard would clearly also be generally reasonable under a totality of the circumstances reasonableness test.

Evtimov also argues that he has a good-faith basis to believe that the wiretaps failed to comply with Bulgarian law. Leaving aside for the moment the fact that strict compliance with Bulgarian law is not required, the defendant's good faith belief apparently began as a conversation with an "experienced criminal attorney in Sofia, Bulgaria."[3] In his reply brief, the defendant supplements this clearly inadequate basis by citations to articles in a Bulgarian newspaper criticizing the appointment of the judge of the Sofia court that oversees wiretaps, as well as the number of wiretaps that have been approved by her and her deputies. This Court has great difficulty in giving any substantial credence to newspaper articles complaining about the number of warrants issued or the manner in which judges in Bulgaria undertake their duties. The Court finds it not somewhat anomalous that the defendant urges the Court to question a detailed

---

enterprise.

[3] The general rule is that evidence obtained from searches carried out by foreign officials in their own countries is admissible in United States courts, even if the search would not otherwise comply with United States law or the law of the foreign country. *See Emmanuel*, 565 F.3d at 1330. Thus, a *Franks v. Delaware*, 438 U.S. 154 (1978), analysis is unwarranted.

sworn affidavit from a law enforcement officer and rely instead on articles written by an unknown person for an unknown newspaper whose sociopolitical views, motives and integrity are completely undisclosed. The government, on the other hand, has submitted a specific and thorough affidavit from a SANS investigator, which details the process for obtaining wiretaps in Bulgaria, describes how the process was complied with in this particular case, and states in no uncertain terms that the wiretap was authorized by the Bulgarian Special Means and Intelligence Act.

Defendant also spends a substantial amount of time arguing that the SANS agent's affidavit would be inadmissible at trial under F.R.E. 803(6). Likely so, but this is not a trial. Nor is it necessary for the government to produce the affidavit submitted to the Sofia City Court in support of the application for the search warrant. Even if the Court found that the Fourth Amendment requirement of reasonableness applies, it would not be our task at this point to second guess the Bulgarian judge's finding that there was a sufficient basis for the search. We question only the reasonableness of the search given the totality of the circumstances. As to this there is no doubt. As pointed out above, given what the FBI wiretaps had already disclosed about Evtimov's active participation by telephone in the ongoing fraudulent conspiracy, a wiretap of his phone was a reasonable next step in the investigation and would, in all likelihood, have resulted in the issuance of a Title III wiretap authorization had he been in this country.

Finally, in response to the government's assertion of the good-faith exception to barring suppression of the Bulgarian wiretaps, the defendant argues that "[t]he notion that U.S. law enforcement authorities had little to no involvement in procuring these wiretaps is simply not true. . . . The entire operation was initiated by the U.S. FBI agents." But of course, even if this

were an accurate statement, it misses the point. What is clear is that once SANS decided to procure the search warrant, the U.S. law enforcement authorities had no say whatsoever in how the warrant was procured or executed. The propriety of the process followed by Bulgarian authorities is not due to anything the FBI did or failed to do. The record is clear that the warrant request procedure, the actual affidavit in support, as well as the duration and execution of the wiretaps themselves were entirely under the control of Bulgarian authorities, with the FBI reduced to requesting that Bulgarian authorities classify the results of the wiretaps in a manner that would allow the FBI to view those results.

For all of these reasons, the motion to suppress is denied.

**SO ORDERED.**  **ENTER:**

March 28, 2016

**RONALD A. GUZMÁN**
**United States District Judge**